**CASE NO.: 22-11322-A**
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

BROWARD COUNTY SHERIFF'S OFFICE,

Appellant/Cross-Appellee,

v.

SCOTT THOMAS,

Appellee/Cross-Appellant.

---

On Appeal from the United States District Court
for the Southern District of Florida
Ft. Lauderdale Division
Case No. 19-61324-CIV-DIMITROULEAS

---

**ANSWER/CROSS-INITIAL BRIEF**

---

Brandon K. Breslow, FBN 123755
Kristin A. Norse, FBN 965634
Stuart C. Markman, FBN 322571
Kynes, Markman & Felman, P.A.
P.O. Box 3396
Tampa, Florida 33601
Telephone: (813) 229-1118
Facsimile: (813) 221-6750
bbreslow@kmf-law.com
knorse@kmf-law.com
smarkman@kmf-law.com
efilings@kmf-law.com

*Counsel for Appellee/Cross-Appellant*

Thomas v. Broward County Sheriff's Office
Appeal No. 22-11322-A

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. Rule 26.1-1, Appellee/Cross-Appellant hereby certifies that the following is a list of all persons and entities that have an interest in the outcome of this case:

1. Breslow, Brandon K., appellate counsel to Appellee/Cross-Appellant Scott Thomas;

2. Broward County Sheriff's Office, Appellant/Cross-Appellee;

3. Dimitrouleas, The Honorable William, Judge, United States District Court, Southern District of Florida, Ft. Lauderdale Division;

4. Kynes, Markman & Felman, P.A., appellate counsel to Appellee/Cross-Appellant Scott Thomas;

5. Law Offices of Carmen Rodriguez, P.A., appellate counsel to Appellant/Cross-Appellee Broward County Sheriff's Office;

6. Markman, Stuart C., appellate counsel to Appellee/Cross-Appellant Scott Thomas;

7. Norse, Kristin A., appellate counsel to Appellee/Cross-Appellant Scott Thomas;

8. OBeidy, Andrew, district court counsel to Appellee/Cross-Appellant Scott Thomas;

Thomas v. Broward County Sheriff's Office
Appeal No. 22-11322-A

9.    OBeidy & Associates, P.A, district court counsel to Appellee/Cross-Appellant Scott Thomas;

10.   Rodriguez, Carmen, appellate counsel to Appellant/Cross-Appellee Broward County Sheriff's Office;

11.   Snow, The Honorable Lurana S., Magistrate Judge, United States District Court, Southern District of Florida, Ft. Lauderdale Division;

12.   Thomas, Scott, Appellee/Cross-Appellant;

13.   Tony, Gregory, in his official capacity as Sheriff of Broward County, Florida, Appellant/Cross-Appellee.

/s/ *Brandon K. Breslow*
Brandon K. Breslow

## STATEMENT REGARDING ORAL ARGUMENT

It is the opinion of the undersigned counsel that the decisional process in this case will be significantly aided by oral argument.  While the appeal brought by the Broward County Sheriff's Office challenges only the sufficiency of the evidence to support the jury's verdict that the Sheriff discriminated against Chief Warrant Officer Scott Thomas based on his prior military service and retaliated against him for engaging in protected activity, the cross-appeal presents a significant issue of first impression involving the interpretation and application of section 4323(d)(1)(C) of the Uniformed Services Employment and Reemployment Rights Act.  The cross-appeal will challenge the district court's refusal to accept the jury's finding that the Sheriff's discrimination and retaliation were willful.  Instead, the district court treated that part of the verdict as "advisory" and declined to award the liquidated damages the finding supported.  Oral argument will assist the Court in deciding this important issue involving the interpretation and application of USERRA's liquidated damages provision.

# <u>TABLE OF CONTENTS</u>

<u>**PAGE**</u>

CERTIFICATE OF INTERESTED PERSONS ................................................... C1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF CITATIONS ........................................................................ vi

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................... 3

    I.    Nature of the Case ............................................................... 3

    II.    Statement of the Facts ......................................................... 4

        A.    Chief Thomas, a decorated Blackhawk pilot and officer in the United States Army, is honorably discharged and works with the FBI and a government agency. ........................ 4

        B.    Chief Thomas successfully applies and interviews to be a helicopter pilot in the Sheriff's new air rescue program. ......... 6

        C.    Chief Thomas is repeatedly subject to chief pilot Danielle Fuller's open hostility about his prior military service. .......... 10

        D.    After Chief Thomas confronts Ms. Fuller about her anti-military comments, she demands the pilots' flight

records and, within three hours of reviewing them, she
recommends Chief Thomas's termination. ............................ 12

E.    Unaware of Ms. Fuller's recommendation, Chief Thomas
complains about Ms. Fuller's anti-military bias to superior
officers until the Sheriff terminates him. ............................... 14

III.    The Course of Proceedings and Disposition in the Court Below ..... 16

A.    Chief Thomas sues the Sheriff for anti-military
discrimination and retaliation, and the Sheriff's motions to
dismiss and for summary judgment are denied. .................... 16

B.    The trial is a swearing match between the military pilots
and the Sheriff about Ms. Fuller's conduct, Chief
Thomas's complaints of discrimination, and the Sheriff's
motivation to terminate him. .................................................. 19

C.    The Sheriff drops its same-decision defense, Chief
Thomas's claims go to the jury, and the jury finds the
Sheriff willfully violated USERRA. ....................................... 23

D.    Chief Thomas moves to amend the judgment to conform
to the jury's verdict, the Sheriff renews its motion for
judgment as a matter of law, and the district court denies
both motions. .......................................................................... 25

iii

IV.   The Standard of Review .................................................... 27

SUMMARY OF THE ARGUMENT .................................................... 28

ARGUMENT ON DIRECT APPEAL ................................................. 30

I.    The evidence that the Sheriff discriminated against Chief
      Thomas based on his prior military service is sufficient and
      supports the jury's verdict. ............................................... 30

      A.    The jury's finding of discriminatory animus is supported
            by evidence of Ms. Fuller's anti-military comments and
            inconsistencies between the reasons the Sheriff gave for
            terminating Chief Thomas and its other actions. ................... 32

            1.    Ms. Fuller's expressed hostility toward military
                  pilots. ........................................................... 32

            2.    The inconsistencies between the Sheriff's claimed
                  reasons for Chief Thomas's termination and its
                  other actions. ................................................. 34

      B.    The Sheriff relies on a burden-shifting framework that
            does not apply and a same-decision affirmative defense it
            abandoned at trial. ................................................... 37

      C.    The Sheriff's sufficiency arguments are wrong as a matter
            of fact and law. ....................................................... 39

iv

D.    Sufficient evidence and the law support a cat's paw theory of liability against the Sheriff. ................................................. 44

II.    The evidence the Sheriff retaliated against Chief Thomas based on his protected activity is sufficient to support the jury's verdict. .................................................................................. 47

III.    The district court did not abuse its discretion when it denied the Sheriff's motion for new trial because the verdict was not against the great weight of the evidence. ....................................... 53

ARGUMENT ON CROSS-APPEAL .................................................... 55

The district court reversibly erred when it declined to award Chief Thomas liquidated damages despite the jury's finding the Sheriff's discrimination was willful. .......................................................... 55

A.    The parties consented to a jury trial on whether the Sheriff's conduct was willful, and the district court was bound by the verdict the jury returned. ................................................. 55

B.    Chief Thomas was entitled to a jury trial as a matter of right on the issue of whether the Sheriff's conduct was willful. ................... 59

CONCLUSION ................................................................ 66

CERTIFICATE OF COMPLIANCE .................................................... 67

CERTIFICATE OF SERVICE .......................................................... 68

## <u>TABLE OF CITATIONS</u>

<u>CASES</u>                                                                                      <u>PAGE(S)</u>

*Alcatel USA, Inc. v. DGI Technologies, Inc.*,

   166 F.3d 772 (5th Cir. 1999) ................................................................. 56-57, 58

*\*Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*,

   515 F.3d 1150 (11th Cir. 2008) ................................................................. 58-59

*Am. Underground Eng'g, Inc. v. City of Syracuse*,

   526 F. App'x 37 (2d Cir. 2013) ........................................................................ 57

*Annarumma v. City of High Springs*,

   846 F. App'x 776 (11th Cir. 2021) ............................................................. 39, 48

*Ard v. Sw. Forest Indus.*,

   849 F.2d 517 (11th Cir. 1988) .................................................................. 53, 54

*\*Bereda v. Pickering Creek Indus. Park, Inc.*,

   865 F.2d 49 (3d Cir. 1989) ....................................................................... 57, 58

*Bhogaita v. Altamonte Heights Condo. Ass'n*,

   765 F.3d 1277 (11th Cir. 2014) ....................................................................... 27

*Bonner v. City of Prichard, Ala.*,

   661 F.2d 1206 (11th Cir. 1981) ....................................................................... 56

*Brink v. Direct Gen. Ins. Co.*,

   38 F.4th 917 (11th Cir. 2022) .......................................................................... 46

*Castaneda v. Partida*,

    430 U.S. 482 (1977) ............................................................ 41

*Castle v. Sangamo Weston, Inc.*,

    837 F.2d 1550 (11th Cir. 1988) .................................... 42, 59

*Chaney v. City of Orlando*,

    483 F.3d 1221 (11th Cir. 2007) ........................................ 27

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,

    526 U.S. 687 (1999) ............................................................ 60

*Cleveland v. Home Shopping Network, Inc.*,

    269 F.3d 1189 (11th Cir. 2004) ........................................ 37

*Coffman v. Chugach Support Servs., Inc.*,

    411 F.3d 1231 (11th Cir. 2005) ................................. *passim*

*Connecticut v. Teal*,

    457 U.S. 440 (1982) ............................................................ 40

*Crane v. Green & Freedman Baking Co.*,

    134 F.3d 17 (1st Cir. 1998) ............................................... 56

*Curtis v. Loether*,

    415 U.S. 189 (1974) ..................................................... 61, 65

*Day v. Liberty Nat'l Life Ins. Co.*,

    122 F.3d 1012 (11th Cir. 1997) ........................................ 65

*DeLee v. City of Plymouth, Ind.,

    773 F.3d 172 (7th Cir. 2014) ................................................ 64

Desert Palace, Inc. v. Costa,

    539 U.S. 90 (2003) ................................................ 48

Dominguez v. Miami-Dade Cnty.,

    416 F. App'x 884 (11th Cir. 2011) ................................................ 43

Drago v. Jenne,

    453 F.3d 1301 (11th Cir. 2006) ................................................ 50, 51

*Feltner v. Columbia Pictures Television, Inc.

    523 U.S. 340 (1998) ................................................ 62, 64

Furnco Constr. Corp. v. Waters,

    438 U.S. 567 (1978) ................................................ 40

Gagnon v. Sprint Corp.,

    284 F.3d 839 (8th Cir. 2002) ................................................ 48

Goldsmith v. Bagby Elevator Co.,

    513 F.3d 1261 (11th Cir. 2008) ................................................ 27

Granfinanciera, S.A. v. Nordberg,

    492 U.S. 33 (1989) ................................................ 60, 65

Hackett v. City of South Bend,

    956 F.3d 504 (7th Cir. 2020) ................................................ 48

*Hance v. Norfolk S. Ry. Co.*,

    571 F.3d 511 (6th Cir. 2009) ................................................. 34

*Hickle v. Am. Multi-Cinema, Inc.*,

    927 F.3d 945 (6th Cir. 2019) ................................................. 33

*Holland v. Gee*,

    677 F.3d 1047 (11th Cir. 2012) ............................................. 37

*Holley v. Ga. Dep't of Corr.*,

    845 F. App'x 886 (11th Cir. 2021) ......................................... 45

*Ins. Co. of N. Am. v. Valente*,

    933 F.2d 921 (11th Cir. 1991) ......................................... 53, 54

*Jones v. Dep't of Health & Human Servs.*,

    703 F. App'x 977 (Fed. Cir. 2017) ......................................... 47

*Lindsey v. Am. Cast Iron Pipe Co.*,

    810 F.2d 1094 (11th Cir. 1987) ............................................. 59

*Loperena v. Scott*,

    No. 2:08-cv-99, 2009 WL 1066253 (M.D. Fla. Apr. 21, 2009) ........................ 44

*Massey v. Gulf Oil Corp.*,

    508 F.2d 92 (5th Cir. 1975) ................................................. 54

*Maxfield v. Cintas Corp. No. 2*,

    427 F.3d 544 (8th Cir. 2005) ................................................. 37

*McGinnis v. Am. Home Mortg. Serv.*,

    817 F.3d 1241 (11th Cir. 2016) ..................................................... 27, 53

*Mich. Abrasive Co. v. Poole*,

    805 F.2d 1001 (11th Cir. 1986) ..................................................... 38, 51

*Middlebrooks v. Hillcrest Foods, Inc.*,

    256 F.3d 1241 (11th Cir. 2001) .......................................................... 27

*\*Middleton v. City of Chicago*,

    578 F.3d 655 (7th Cir. 2009) ........................................................ 61, 64

*Munoz v. Selig Enters., Inc.*,

    981 F.3d 1265 (11th Cir. 2020) .......................................................... 50

*Nielsen v. Preap*,

    139 S. Ct. 954 (2019) ......................................................................... 61

*Oncale v. Sundowner Offshore Servs., Inc.*,

    523 U.S. 75 (1998) ............................................................................. 40

*Pals v. Schepel Buick & GMC Truck, Inc.*,

    220 F.3d 495 (7th Cir. 2000) .............................................................. 56

*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*,

    7 F.4th 989 (11th Cir. 2021) .............................................................. 56

*Schmidt v. City of Atlanta*,

    558 F. App'x 953 (11th Cir. 2014) ..................................................... 49

x

*Sheehan v. Dep't of the Navy*,

    240 F.3d 1009 (Fed. Cir. 2001) ............................................................. 31, 42, 44

\*Sibley v. Fulton DeKalb Collection Serv.*,

    677 F.2d 830 (11th Cir. 1982) ................................................................. 62, 63

\*Staub v. Proctor Hosp.*,

    562 U.S. 411 (2011) ................................................................................. 44, 45

*Stimpson v. City of Tuscaloosa*,

    186 F.3d 1328 (11th Cir. 1999) ............................................................... 44

*Taylor v. Mentor Worldwide LLC*,

    940 F.3d 582 (11th Cir. 2019) ................................................................. 27, 39

*Thompson v. Parkes*,

    963 F.2d 885 (6th Cir. 1992) ................................................................... 58

\*Trans World Airlines, Inc. v. Thurston*,

    469 U.S. 111 (1985) ................................................................................. 61

*Tull v. United States*,

    481 U.S. 412 (1987) ................................................................................. 60

*U.S. Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*,

    842 F.3d 1333 (11th Cir. 2016) ............................................................... 27-28

\*Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*,

    473 F.3d 11 (1st Cir. 2007) ..................................................................... 52

*Waldrop v. S. Co. Servs., Inc.*,

   24 F.3d 152 (11th Cir. 1994) ................................................ 63-64, 65

*Wallace v. San Diego*,

   479 F.3d 616 (9th Cir. 2007) ............................................... 52

*Ward v. United Parcel Serv.*,

   580 F. App'x 735 (11th Cir. 2014) ...................................... 47

*Warren v. Ford Motor Credit Co.*,

   693 F.2d 1373, (11th Cir. 1982) ......................................... 54

*Weeks v. Harden Mfg. Corp.*,

   291 F.3d 1307 (11th Cir. 2002) .......................................... 48

*Whiting v. Jackson State Univ.*,

   616 F.2d 116 (5th Cir. 1980) .............................................. 56

*Williams v. City of Valdosta*,

   689 F.2d 964 (11th Cir. 1982) ............................................ 53

## OTHER AUTHORITIES

15 U.S.C. § 1692 ................................................................. 63

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

38 U.S.C. § 4303 ................................................................. 48

*38 U.S.C. § 4311 ........................................................................ *passim*

*38 U.S.C. § 4323 ........................................................................ *passim*

*Fed. R. Civ. P. 39 .............................................................................. 55

20 C.F.R. § 1002.22 ..................................................................... 16, 38

H.R.Rep. No. 103–65(I) ..................................................................... 61

Antonin Scalia & Bryan A. Garner,

    *Reading Law: The Interpreatation of Legal Texts* (2012) .................................. 60

Charles Alan Wright & Arthur R. Miller,

    *Federal Practice and Procedure* § 2333 (4th ed. 2022) .................................... 57

Black's Law Dictionary (5th ed. 1979) .................................................... 62

Webster's New International Dictionary (2d ed. 1949) .......................................... 62

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a civil case arising under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4311(a), (b). The district court had jurisdiction under 28 U.S.C. § 1331, the federal question statute. The Broward County Sheriff's Office filed a timely notice of appeal from the judgment on April 22, 2022, Doc.124, and Plaintiff Scott Thomas filed a timely notice of cross-appeal, Doc.125. This Court has jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

The direct appeal presents three issues:

I.      Was the evidence sufficient for the jury to find the Sheriff discriminated against Chief Thomas based on his military service?

II.     Was the evidence sufficient for the jury to find the Sheriff retaliated against Chief Thomas based on protected activity he took to enforce USERRA?

III.    Did the district court act within its discretion when it denied the Sheriff's motion for new trial because the verdict was not contrary to the great weight of the evidence?

The cross-appeal raises one additional issue:

I.      Did the district court err when it declined to award liquidated damages despite the jury's finding the Sheriff willfully violated USERRA?

## STATEMENT OF THE CASE

### I.    Nature of the Case

Chief Warrant Officer Scott Thomas, a United States Army veteran, sued his former employer, the Broward County Sheriff's Office, for discrimination and retaliation under USERRA, 38 U.S.C. §§ 4311(a), (b).  Doc.16.  During a four-day jury trial, Chief Thomas presented evidence the Sheriff unlawfully terminated him from his position as an air rescue pilot based on the recommendation of his supervisor, Danielle Fuller, who had made hostile anti-military comments toward him and the other military pilots in his unit.  Chief Thomas was terminated after he complained about Ms. Fuller's comments and conduct to her and to their superiors. The proffered reason for his termination was based on facts the Sheriff knew when it hired him.

A jury found the Sheriff willfully discriminated and retaliated against Chief Thomas and that his lost wages and benefits totaled $240,000.  Doc.88.  The district court entered a judgment against the Sheriff for only that amount.  Doc.90.  It did not include the equal amount of liquidated damages that USERRA provides for willful violations.  38 U.S.C. § 4323(d)(1)(C).

The Sheriff's appeal challenges the sufficiency of the evidence but omits or brushes aside record evidence that fully supports the jury's verdict.[1]  For that reason, a more complete statement of the relevant facts is provided.  Chief Thomas cross-appeals the district court's post-trial decision to treat the jury's verdict on willfulness as advisory to decline to award the liquidated damages USERRA provides for willful violations.

## II.    Statement of the Facts

### A.    Chief Thomas, a decorated Blackhawk pilot and officer in the United States Army, is honorably discharged and works with the FBI and a government agency.

After Chief Thomas graduated with a business degree from the University of Florida, he enlisted in the United States Army in May 2004.  Doc.53 at 4; Doc.108 at 119-20.  Chief Thomas completed flight training at Fort Rucker and became a Blackhawk helicopter pilot.  Doc.108 at 120.  He served in several battalion and unit officer positions, accruing more than 1,600 pilot hours over the course of 400 flights.  Doc.98-4 at 3; Doc.108 at 120, 125.  Chief Thomas also completed three overseas deployments in Iraq and Afghanistan, where he flew 957 hours in combat.  Doc.98-4 at 3; Doc.108 at 120.

---

[1] The Sheriff also did not include trial transcripts in its appendix.  Because the transcripts are necessary to the Court's sufficiency review, they are included in Chief Thomas's supplemental appendix.

Chief Thomas received his honorable discharge from the Army at the end of 2011. Doc.108 at 120, 125. At that time, he was ranked Chief Warrant Officer 2 and had earned multiple Air Medals, several Army Commendation Medals, numerous Overseas Service Ribbons, the NATO Service Ribbon, the Army Service Ribbon, the Global War on Terror Ribbon, and the Combat Action Badge. Doc.53 at 4; Doc.108 at 125-26.

Chief Thomas continued to fly in service of his country as a Special Applications Group contractor supporting the FBI Hostage Rescue Team. Doc.98-2 at 1; Doc.98-8 at 3; Doc.108 at 126, 130. The classified nature of this job prompted him to create two flight logbooks. Chief Thomas kept one in his office desk because it included confidential information about his covert missions, including the type of aircraft, tail numbers, and flight locations. Doc.108 at 127-28. Senior FBI agents reviewed this logbook annually and never objected to its accuracy. *Id.* at 129.

Chief Thomas compiled another logbook using a cell phone application. *Id.* at 127. This electronic logbook, which Chief Thomas created for personal use, included flight entries altered to ensure that identifying information would not be traced back to FBI aircraft or the location of rescue missions. Doc.98-5; Doc.108 at 128-29, 134. The Federal Aviation Administration describes this practice as the special tactics, techniques, and procedures, or "TTPs," of a government agency.

Doc.107 at 114-16. The electronic logbook also included Chief Thomas's military flights. Doc.98-5.

Chief Thomas resigned from the Special Applications Group after four years, in April 2016, when he was recruited to work for an undisclosed agency that supported the United States government. Doc.98-2 at 1; Doc.108 at 130-131. He stored his paper logbook in Fredericksburg, Virginia, and would need FBI clearance to disclose its contents. Doc.108 at 127, 130. Chief Thomas left that job in February 2018 to return to his family in Florida and pursue a new job as a pilot. Doc.98-2 at 2; Doc.108 at 134.

### B.  Chief Thomas successfully applies and interviews to be a helicopter pilot in the Sheriff's new air rescue program.

In 2018, the Broward County Sheriff's Office transitioned responsibility for its air rescue missions from the law enforcement aviation unit to the Department of Fire Rescue. Doc.106 at 87, 117. The Sheriff invited applicants for the open position of air rescue helicopter pilot. Doc.53 at 4; Doc.98-1 at 1. The job posting listed six requirements: (1) a high school diploma; (2) a rotorcraft-helicopter commercial and instrument rated license; (3) an FAA first- or second-class medical certificate; (4) 1,000 flight hours as a pilot-in-command of a rotorcraft-helicopter ("PIC flight hours"); (5) 250 night flight hours of a rotorcraft-helicopter ("night flight hours"); and (6) 50 flight hours of a rotorcraft-helicopter within the last 12 months ("currency flight hours"). Doc.98-1 at 2.

Chief Thomas applied for the job in April 2018. Doc.53 at 4; Doc.108 at 140. His résumé showed he met all but one requirement—his currency flight hours. Doc.98-2 at 1. Chief Thomas stated in his résumé that he had 2,080 total flight hours, including 1,500 PIC flight hours, 950 combat flight hours, and 530 night-vision-goggle flight hours. Doc.53 at 4; Doc.98-2 at 1. He did not have 50 currency flight hours because he had not flown since his last pilot job ended two years earlier. Doc.108 at 152. Chief Thomas paid thousands of dollars to acquire currency hours in advance of his first interview to "show BCSO that [he] was serious about the job." *Id.*

The Sheriff called Chief Thomas in June for an initial panel interview that included Chief Tammy Nugent, the Department of Fire Rescue's division chief in charge of emergency medical services, and Deputy Brian Miller, the law enforcement aviation unit's chief pilot. Doc.106 at 116-17, 166-67; Doc.107 at 87, 195-96; Doc.108 at 151. They asked Chief Thomas a series of aviation-related questions, and he explained he was earning his currency flight hours. Doc.108 at 151-52.

Chief Thomas returned for a second interview with Chief Nugent and Deputy Miller on August 2, 2018. Doc.53 at 4; Doc.108 at 153-54. He took a written exam

on Part 135 regulations[2] and answered questions about flight scenarios.  Doc.108 at 153, 156.  Deputy Miller also asked Chief Thomas for his flight records.  *Id.* at 156-57.  Chief Thomas explained that he had an electronic logbook with him and his paper logbook in Fredericksburg detailed covert missions.  *Id.* at 157, 169-170. Deputy Miller accepted Chief Thomas's electronic logbook and never asked him to provide his paper logbook or military flight records.  *Id.* at 129, 157.  Deputy Miller used the records Chief Thomas presented to complete an applicant checklist of flight experience.  Doc.98-8 at 26; Doc.106 at 103-05; Doc.108 at 167-68.

Deputy Miller mentioned to Chief Thomas that the electronic logbook did not specify cross-country[3] or night cross-country flight hours.  Doc.108 at 158-59. Those qualifications were not listed on the job posting, Doc.98-1 at 2, but Deputy Miller's applicant checklist included requirements of "100 hours cross country" and "25 hours night cross country."  Doc.98-8 at 26; Doc.108 at 161.  Chief Thomas explained that he had over 900 combat flight hours, that most of his missions were flights beyond 25 miles, and that the Army did not log his cross-country flight time. Doc.108 at 161-62.

---

[2] Part 135 regulations govern the administration and operation of charter air carriers, which cater to paying passengers.  Doc.107 at 128.  Chief Thomas had not previously flown under Part 135.  Doc.108 at 155.

[3] A cross-country flight is one more than 25 miles.  Doc.108 at 159.

Deputy Miller confirmed on the applicant checklist that Chief Thomas had 100 cross-country flight hours.  Doc.98-8 at 26.  But he said he could not continue the interview without a record of Chief Thomas's night cross country-flight time.  Doc.108 at 165-66.  He told Chief Thomas to make a blanket entry in the electronic logbook that reflected their conservative estimate that Chief Thomas had completed 500 night cross-country flight hours.  *Id.* at 162, 169.  At no time during the hiring process did Deputy Miller or anyone else take issue with the rounded number of flight hours listed on Chief Thomas's résumé with the hours recorded in the electronic logbook, which would have shown only slight discrepancies.[4]  Both sets of figures exceeded the job requirements.  Doc.98-1 at 2.

The Sheriff invited Chief Thomas back the next day for a helicopter flight test with Deputy Miller.  Doc.108 at 166, 170.  The Sheriff hired Chief Thomas as of November 26, 2018, after reviewing his electronic logbook (which included the blanket entry for cross-country night hours) and knowing that his paper logbook included confidential information, that the paper logbook was not readily available, and that he lacked Part 135 experience.  Doc.53 at 4; Doc.108 at 167, 169-171.

---

[4] Chief Thomas had 2,080 total flight hours on his résumé compared to 2,131 hours logged; 1,500 PIC flight hours compared to 1,431 hours logged; and 530 night-vision goggle flight hours compared to 531 hours logged.  Doc.98-1 at 1; Doc.98-5 at 32.

C.    **Chief Thomas is repeatedly subject to chief pilot Danielle Fuller's open hostility about his prior military service.**

The Sheriff hired four other recruits for the new air rescue unit: (1) Timothy Larsen, a 23-year Army veteran who also served as a Chief Warrant Officer; (2) Brian McDonald, a Commander and Aviator in the United States Navy for 24 years; (3) Jonathan Weiers, a Chief Warrant Officer with the United States Army; and (4) Danielle Fuller, a civilian-trained pilot of 15 years.  Doc.53 at 4; Doc.107 at 59-61; Doc.108 at 95, 173-74.  Chief Nugent, a civilian, oversaw the unit even though she was not a pilot.  Doc.108 at 174.  Chief Larsen was the unit's initial director of operations, and Ms. Fuller was the chief pilot.  Doc.107 at 71-72, 94-95.

Ms. Fuller soon "target[ed]" Chief Larsen based on his qualifications and plans for the unit.  Doc.107 at 72-74; Doc.108 174-76.  After Ms. Fuller questioned Chief Larsen's integrity and argued with him in front of the other pilots, Chief Nugent demoted Chief Larsen and named Ms. Fuller the interim director of operations.  Doc.107 at 72-74; Doc.108 at 174-176.  This left a civilian pilot, Ms. Fuller, in charge of the unit's four military pilots.

The pilots were working through a condensed 16-week EMT training course led by Jason Smith, a battalion chief for the Department of Fire Rescue.  Doc.105 at 7-9; Doc.106 at 126; Doc.107 at 72; Doc.108 at 180.  The curriculum was challenging, but it was made even more difficult because Ms. Fuller repeatedly degraded Chief Thomas and the other military pilots who were now her

subordinates.  On multiple occasions, Ms. Fuller called Chief Thomas dumb, stupid, incapable of doing his job, and incompetent.  Doc.106 at 169, 179; Doc.107 at 77; Doc.108 at 177-81.

Ms. Fuller also attacked her subordinates about their military service. Ms. Fuller told the pilots that "military guys all think the same way."  Doc.106 at 168.  She discounted their suggestions because she claimed the way they flew in the military was not how it was done "in the real world."  *Id.*  She said they were "incapable of doing the Part 135 missions[.]"  Doc.108 at 181.  She complained to them it was "unfair" they did not have to pay for their flight hours, experience, and pilot ratings in the military but that she had the same job as them after 15 years as a civilian pilot and earned the same salary.  Doc.106 at 168-69, 189; Doc.108 at 183; *see also* Doc.107 at 76 ("[D]uring a break, she'd be like, 'You military guys, you have such a good life.  You just go to flight school and it's free and you become pilots[.]'").  And she told them she "knew plenty of other people[,]" e.g. "civilian pilots[,]" that were more "capable" than them "doing the missions."  Doc.108 at 181-82.

Chief Thomas confronted Ms. Fuller about her anti-military bias.  Doc.106 at 171; Doc.107 at 79-81; Doc.108 at 179-181.  On December 26, 2018, the unit was on an airboat in the Everglades when Ms. Fuller told Chief Thomas she knew "better qualified civilian pilots" that could not only "replace [them] as military pilots" but

that "she would rather have in the unit." Doc.108 at 185-86. Chief Thomas complained to Ms. Fuller that her comment was not fair and she "never once asked about any of [their] experiences[.]" *Id.* at 186.

Ms. Fuller also refused to grant Chief Thomas leave for an annual physical at the VA hospital. Doc.106 at 170; Doc.107 at 80; Doc.108 at 185. When Chief Thomas explained to Ms. Fuller that he was legally required to go to his VA appointment, she told him that she was the "mother," they were the "children," and "children weren't allowed to question their parents." Doc.108 at 185.

### D. After Chief Thomas confronts Ms. Fuller about her anti-military comments, she demands the pilots' flight records and, within three hours of reviewing them, she recommends Chief Thomas's termination.

On January 2, 2019—one week after Chief Thomas confronted Ms. Fuller in the Everglades—Ms. Fuller decided to investigate the unit pilots' flight records. She directed them to complete a pilot experience form with their certifications, ratings, and flight hours. Doc.98-3 at 1 at 1; Doc.108 at 187.

Chief Thomas completed the form while referencing his electronic logbook. Doc.108 at 188, 191-92. Chief Thomas stated he had 2,131 total flight hours, 1,431 PIC flight hours, 2,029 turbine flight hours, 531 night-vision-goggle flight hours, 1,610 cross-country flight hours, 411 night cross-country hours, and 51

currency flight hours.  Doc.98-3 at 1.[5]  As noted, these logged hours were slightly different than the numbers on his résumé, but they exceeded the minimum requirements of the Sheriff's job posting.  Doc.98-1 at 2.

Ms. Fuller followed up with a group text message to the pilots on January 10 asking them to bring their flight logbooks to her that same day.  Doc.107 at 20; Doc.108 at 187.  Chief Thomas, who was at the fire station when he received the text, offered Ms. Fuller a copy of the electronic logbook he had provided to Deputy Miller and explained his paper logbook was in secure storage in Fredericksburg. Doc.106 at 76; Doc.107 at 21-22.  Chief Thomas asked Ms. Fuller if she wanted his paper logbook, but she said it was not necessary.  Doc.107 at 21-22, 42.  Other than a rounding of fractional hours to the nearest whole number, a two-hour difference in the figure for PIC flight hours, and a three-hour difference in cross-country hours, Chief Thomas's electronic logbook aligned with the information he had included on the pilot experience form.  Doc.98-3 at 1; Doc.98-5 at 32.  Again, all of these hours exceeded the minimum requirements from the Sheriff's job posting.  Doc.98-1 at 2.

The air rescue unit's EMT course concluded at 3:00 p.m.  Doc.107 at 225. Only three hours later, at 6:19 p.m., Ms. Fuller sent an email to Deputy Chief Timothy Keefe and Chief Nugent that recommended they terminate Chief Thomas.

---

[5] Chief Thomas inadvertently checked a box that he had an airline transport pilot, or "ATP," certificate rather than a commercial license, Doc.98-3 at 1, but everyone knew this was an oversight, Doc.106 at 16-17; Doc.107 at 47.

Doc.96-2 at 1. Ms. Fuller stated her review of Chief Thomas's records "revealed unverifiable flight experience with major discrepancies between his application, logbook, and pilot experience form." *Id.*

### E. Unaware of Ms. Fuller's recommendation, Chief Thomas complains about Ms. Fuller's anti-military bias to superior officers until the Sheriff terminates him.

Unaware of Ms. Fuller's termination request, Chief Thomas decided to escalate his complaints about Ms. Fuller after she denied his request for leave to attend his VA appointment. Doc.108 at 200. Chief Thomas and Commander McDonald, the 24-year Navy pilot, went to their EMT instructor, Chief Smith, on January 17 to complain about Ms. Fuller. *Id.* at 201. They brought up the "derogatory terms" Ms. Fuller used, her "animosity toward[]" the military pilots, her comments about replacing the military pilots with civilian-trained pilots, and that she denied Chief Thomas leave for his annual VA appointment. Doc.106 at 172-73; Doc.108 at 201. Chief Smith said he would talk with Chief Nugent about their complaints and ask her to meet with them individually. Doc.106 at 174; Doc.108 at 202.

The next day, Chief Smith told the unit pilots that Chief Nugent would come to the class at 1:00 p.m. to address Ms. Fuller's conduct. Doc.108 at 203. Chief Nugent showed up two hours late and told the pilots she would meet with them as a group to "get the meeting done fast." *Id.* Chief Thomas was the only pilot to speak

14

up. *Id.* at 204. He told Chief Nugent that Ms. Fuller was biased against the military pilots, that she had used derogatory terms, and that she denied his request to take leave for a VA appointment. Doc.107 at 83; Doc.108 at 204. Chief Nugent told the pilots they needed to find a way to get along and disregarded Chief Thomas's complaints of discrimination. Doc.107 at 101; Doc.108 at 203.

Chief Nugent summoned Chief Thomas to the Sheriff's air hangar 10 days later, on January 28. Doc.108 at 205. She was there with Ms. Fuller and Sergeant Jesse Madrigal, the director of operations for the law enforcement aviation unit. *Id.* at 155, 201. They took Chief Thomas into a conference room and told him he had two options—resignation or termination. *Id.* at 206. The Sheriff had prepared two different letters to that effect, and Chief Nugent added that resignation was his "best option" because he would not work for another law enforcement agency if the Sheriff terminated him. *Id.* Chief Thomas asked why he was being terminated. *Id.* at 207. When they refused to tell him, Sergeant Madrigal stood up and told Chief Thomas he would be escorted off the premises if he did not comply. *Id.*

Ms. Fuller then told Chief Thomas he was being terminated for discrepancies in his logbook. *Id.* When Chief Thomas asked for an example, she pointed to an entry where he had inverted two tail numbers. *Id.* at 207-08. He explained it was related to his contract work for the FBI, but she ignored him. *Id.* at 208. Ms. Fuller also cited Chief Thomas's blanket entry for night cross-country flight hours, which

15

Chief Thomas explained he made based on his consultation with Deputy Miller. *Id.* at 209-10. Chief Thomas told them that he was never asked for his official records and offered to provide his paper logbook from Fredericksburg. *Id.* at 209. His explanations and offer were to no avail. *Id.* at 209-10. Chief Thomas, left without any reasonable alternative, signed the resignation letter and was constructively terminated by the Sheriff. *Id.* at 210-211.

## III.   The Course of Proceedings and Disposition in the Court Below

### A.   Chief Thomas sues the Sheriff for anti-military discrimination and retaliation, and the Sheriff's motions to dismiss and for summary judgment are denied.

Chief Thomas sued the Sheriff for discrimination based on military service and retaliation when he engaged in protected activity by complaining about discrimination. Doc.16. Chief Thomas had to prove his military service or protected activity was a "motivating factor in the employer's action[.]" 38 U.S.C. § 4311(c). Chief Thomas sought the amount of his lost wages and benefits, as well as liquidated damages for the Sheriff's willful failure to comply with USERRA. *Id.* §§ 4323(d)(1)(B), (C).

The Sheriff denied discriminating or retaliating against Chief Thomas. It also initially raised the affirmative defense that it would have made the same decision to terminate Chief Thomas for a legitimate reason regardless of his military service or protected activity. *Id.* § 4311(c); *see also* 20 C.F.R. § 1002.22 ("employer has the

16

burden to prove the affirmative defense that it would have taken the action anyway"). The Court's pattern jury instructions refer to this as the employer's "same-decision" defense.  Eleventh Circuit Pattern Jury Instructions (Civil Cases) 4.18 (2022).

At both the dismissal and summary-judgment stages, the Sheriff argued Chief Thomas failed to establish his termination was due to prior military service and not a "legitimate, non-discriminatory reason."  Doc.17 at 5-12; Doc.37 at 3-11.  The Sheriff asserted in its motion to dismiss that its "legitimate" reason for firing Chief Thomas was that he "fail[ed] to demonstrate his qualifications to be a pilot" and had "errors or discrepancies" in his logbook that he did not explain with documentation. Doc.17 at 8-10.  The Sheriff slightly altered this assertion in its motion for summary judgment and said the "legitimate" reason for Chief Thomas's termination was that he had "discrepancies in his backup logbook" and in "documentation of flight experience" including "incorrect tail numbers."  Doc.37 at 17.  The Sheriff also argued Chief Thomas's retaliation claim failed because he did not engage in protected activity and, even if he had, he could not prove that protected activity caused his termination.  Doc.17 at 12-14; Doc.37 at 11-14.

The district court denied both motions based on this Court's precedent. Docs.20, 54 (citing *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005)).  As to discrimination, the district court explained discriminatory motive can be inferred from a host of facts, including: (1) "proximity in time between

17

the employee's military activity and the adverse employment action"; (2) "inconsistencies between the proffered reason and other actions of the employer"; (3) "an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity"; and (4) "disparate treatment of certain employees compared to other employees with similar work records or offenses." Doc.20 at 8-9; Doc.54 at 5 (citing *Coffman*, 411 F.3d at 1238).

The district court ruled—first based on the facts alleged in the Second Amended Complaint and then after review of the summary-judgment evidence— that discriminatory motive could be gleaned from Ms. Fuller's expressed hostility toward the military pilots and the inconsistencies between the Sheriff's proffered reason for Chief Thomas's termination and the Sheriff's other actions. Doc.20 at 9; Doc.54 at 5. The district court also ruled the Sheriff failed to demonstrate prior to trial that it had a legitimate, non-discriminatory reason for terminating Chief Thomas. Doc.20 at 9; Doc.54 at 6. Finally, the district court twice ruled that Chief Thomas's retaliation claims presented disputed factual issues as to whether his complaints about Ms. Fuller's conduct to Ms. Fuller and their superiors were protected activity that motivated his termination. Doc.20 at 10-12; Doc.54 at 7-8.

**B.    The trial is a swearing match between the military pilots and the Sheriff about Ms. Fuller's conduct, Chief Thomas's complaints of discrimination, and the Sheriff's motivation to terminate him.**

At trial, Chief Thomas explained his candid application and interview process with the Sheriff, Ms. Fuller's anti-military and other derogatory comments, his complaints about those comments and her other conduct, her sudden and targeted investigation into his flight qualifications, and his termination. He also walked the jury through his military and government flight experience, including his flight records. Doc.107 at 9–60; Doc.108 at 118-246.

Commander McDonald and Chief Larsen corroborated Chief Thomas's account of Ms. Fuller's anti-military bias and his related complaints to her and their superior officers. Doc.106 at 164-193; Doc.107 at 60-109. Commander McDonald testified to Ms. Fuller's derogatory comments to Chief Thomas and her similar animus toward all the military pilots. For example, he explained that he was insulted when Ms. Fuller told them all "military guys think the same way" and that she thought it was "unfair" they did not pay for their flight experience. Doc.106 at 168-69. He explained he went with Chief Thomas to complain to Chief Smith about Ms. Fuller's "beratement of them" and "military-based discrimination." *Id.* at 173. Chief Larsen also testified to Ms. Fuller's "disrespectful" and "derogatory" remarks to military pilots about their experience and his observation that Ms. Fuller treated military pilots worse than civilian pilots. Doc.107 at 76-78.

19

The Sheriff called Chief Nugent, Chief Smith, Deputy Miller, and Ms. Fuller to attempt to contradict that evidence. But Ms. Fuller's testimony about her own conduct was equivocal. For example, Ms. Fuller denied calling Chief Thomas "incompetent" but then descended into an explanation that they "were in a room doing EMT training and there's banter going on," and that "everybody was giving everybody a hard time." *Id.* at 175. She also said she did not "make a habit of demeaning" Chief Thomas and could not "remember" referring to him in a derogatory manner. *Id.* at 177. She made similar excuses when she was asked whether she called Chief Thomas "dumb" or "stupid." *Id.* at 214-15.

Ms. Fuller's testimony about her investigation into Chief Thomas's flight records was both a subject of cross-examination and disputed by other evidence. Her stated motive for deciding to compile flight records a week after Chief Thomas complained about her anti-military comments was called into question. Ms. Fuller said she had recordkeeping requirements as chief pilot. *Id.* at 146, 148. But the FAA did not designate her as chief pilot for the new air rescue unit until March 2019, months after she successfully pushed for Chief Thomas's termination. Doc.106 at 6-9. Moreover, the unit already "had paperwork to fly under Part 135 regulations," and none of the military pilots were flying under Part 135 at that time because they were still in EMT training. Doc.106 at 9-10; Doc.107 at 194-96, 200-201; *see also* IB12 (EMT training preceded the pilot certification process).

20

Ms. Fuller also asserted Chief Thomas's electronic logbook was unacceptable for verification, but she reviewed it anyway. Doc.107 at 150, 157-58. She rejected his offer to obtain the paper logbook, *Id.* at 21-22, 42, even though, as the Sheriff now contends, it is a "correct" and "official" record that "did not have discrepancies," IB5. She concluded that Chief Thomas had unverifiable flight experience, but evidence showed the Sheriff had learned all about his electronic logbook when Deputy Miller interviewed him and later used it to permit Chief Thomas to take a test flight in a government helicopter and to hire him. Doc.98-8 at 26; Doc.106 at 90, 103-05; Doc.108 at 156-58.

As for Ms. Fuller's complaint that the PIC hours on Chief Thomas's résumé exceeded the hours in the logbook and his pilot experience form, she admitted that her issue with the discrepancy was that it hypothetically could have put him at an advantage over unidentified pilots that were "more eligible"—not that it made Chief Thomas ineligible. Doc.106 at 11.

The Sheriff's other witnesses were defensive but not definitive. Chief Nugent and Deputy Miller claimed, contrary to the testimony of Chief Thomas, that they told Chief Thomas during his interview that he would need to produce his paper logbook. But they acknowledged they did not tell him when or how he should do that. *Id.* at 91, 107, 122-23, 143-44. Chief Nugent denied she was aware of Ms. Fuller's discriminatory conduct or her demeaning behavior, even though Chief

21

Thomas and Chief Larsen testified that Chief Nugent was made aware of those issues during the January 18 meeting.  Doc.106 at 127-28; Doc.107 at 83; Doc.108 at 204.

Deputy Miller testified he did not tell Chief Thomas to make a blanket entry for his night cross-country hours and that he would not have accepted an electronic logbook as "official."  Doc.106 at 92-93.  But he could not recall what he used to complete the applicant checklist for Chief Thomas, only that it was "some type of paperwork or cell phone copy of something[.]"  *Id.* at 93.  In addition to Chief Thomas's testimony that he gave Deputy Miller his electronic logbook to verify his flight qualifications, it was undisputed that the only documentation Chief Thomas gave the Sheriff with his flight hours were his résumé, his electronic logbook, and the pilot experience form.  Doc.53 at 3; Doc.108 at 167-68.

Finally, Chief Nugent testified about her meeting with Ms. Fuller and Sergeant Madrigal to address Ms. Fuller's recommendation to terminate Chief Thomas.  Doc.106 at 133-34, 146-148.  As noted, Chief Thomas had complained to Chief Nugent about Ms. Fuller's hostile conduct and discrimination on January 18.  Doc.107 at 83; Doc.108 at 204.  No action was taken.  In the interim, Ms. Fuller met with Chief Nugent to go over her review of Chief Thomas's records without giving Chief Thomas a chance to address her concerns or produce his paper logbook.  Doc.106 at 147; Doc.107 at 21-22, 42; Doc.108 at 209-10.  Chief Nugent, who had no aviation experience, admitted she would not have known what she was looking

for without Ms. Fuller and must "rely on [her] experts to tell her that's not right[.]" Doc.106 at 148.

When the Sheriff moved for judgment as a matter of law, it claimed it treated military pilots the same and argued its same-decision defense. *Id.* at 194-201. The district court denied the Sheriff's motion and ruled the evidence was sufficient to prove discrimination if the jury believed Chief Thomas's testimony. *Id.* at 198, 200-01. It also explained the jury could find that the motivating factor for Chief Thomas's termination was his complaints about Ms. Fuller's discriminatory conduct, not "because he didn't do the logs[.]" *Id.* at 198.

### C.    The Sheriff drops its same-decision defense, Chief Thomas's claims go to the jury, and the jury finds the Sheriff willfully violated USERRA.

Before trial, the parties submitted joint proposed jury instructions that mirrored this Court's pattern USERRA jury instructions. Doc.71. They included an instruction telling the jury to consider and decide whether the Sheriff's discrimination and retaliation, if found, were willful. *Id.* at 29, 35. That is the statutory precondition to an award of liquidated damages under USERRA. 38 U.S.C. § 4323(d)(1)(C).

The joint proposed instructions did not include this Court's pattern instructions on the employer's same-decision defense, which the Sheriff pleaded and bore the burden to prove. Doc.71 at 27, 33. At the charge conference, the district

23

court asked the Sheriff about the affirmative defenses. Doc.106 at 202-03. Counsel for the Sheriff responded, "I don't think we're going to proceed with the affirmative defense[.]" *Id.* at 203. The Sheriff agreed to instructions that excluded the same-decision defense and a verdict form that did not ask the jury to decide it. *Id.* at 203, 207.

The instructions were read to the jury without objection. Doc.89; Doc.105 at 43-59. The jury deliberated two hours before it returned its only question: "If [Ms.] Fuller is discriminatory, does that make [the Sheriff] discriminatory?" Doc.105 at 64. The parties agreed on the legally correct response: "If you find that [Ms.] Fuller was the decision-maker or [Chief] Nugent rubber-stamped her decision, the answer is yes." *Id.* at 69. The district court sent the answer back to the jury, and the jury returned a verdict in favor of Chief Thomas an hour later. *Id.* at 70.

The jury found the Sheriff discriminated against Chief Thomas based on his military service and retaliated against him for protected activity. Doc.88. It awarded Chief Thomas $240,000 in damages for his lost wages and benefits as a result of the Sheriff's discrimination. *Id.* at 2. It also found the discrimination and retaliation were willful. *Id.* at 2, 4. That finding entitled Chief Thomas to liquidated damages equal to his lost wages and benefits—an additional $240,000. 38 U.S.C. § 4323(d)(1)(C). After the district court excused the jury, it told the parties it would enter judgment and concluded the trial. Doc.105 at 75.

24

### D.    Chief Thomas moves to amend the judgment to conform to the jury's verdict, the Sheriff renews its motion for judgment as a matter of law, and the district court denies both motions.

The district court entered a final judgment in Chief Thomas's favor and against the Sheriff for $240,000, plus post-judgment interest. Doc.90. Despite the jury's finding of willfulness, the judgment did not include liquidated damages. *Id.*

Chief Thomas moved to amend the judgment to conform to the jury's verdict. Doc.95. He cited USERRA's liquidated damages provision and explained the parties agreed a willfulness instruction would be submitted to the jury along with a verdict form addressing willfulness. *Id.* at 2. He argued the jury's finding of willfulness gave him the right to recover liquidated damages. *Id.* at 2-3. In response, the Sheriff argued—for the first time—that the jury could offer only "an advisory opinion as to [willfulness]" because the statute says "the court may require the employer to pay" a servicemember or veteran liquidated damages "if the court determines" the employer's violation was willful. Doc.104 at 1-2 (citing 38 U.S.C. § 4323(d)(1)(C)). The Sheriff asked the district court to deny liquidated damages. *Id.* at 2-3.

Meanwhile, the Sheriff filed its renewed motion for judgment as a matter of law, which asked alternatively for a new trial. Doc.103. The motion cited cherry-picked portions of the trial record and rehashed many of its arguments the district court already rejected because they involved fact disputes for the jury. *Id.* at 3-15.

25

The Sheriff also argued it could not be held liable for Ms. Fuller's discriminatory conduct because she was not the decision-maker, and it relied on the same-decision defense that it dropped during trial. *Id.* at 8-9, 15-18. Finally, the Sheriff asked for a new trial because the evidence was "weak" and "attenuated." *Id.* at 19.

The district court denied both parties' post-trial motions. Doc.120. It ruled again there was evidence from which a reasonable jury could find discriminatory motive for Chief Thomas's termination and that he had engaged in protected activity when he lodged complaints about Ms. Fuller's anti-military animus. *Id.* at 5. The district court also gave the Sheriff the benefit of having considered its waived affirmative defense when it said there were "ample … inconsistencies, weaknesses, contradictions, and implausibilities" that showed the Sheriff would not have terminated Chief Thomas for legitimate reasons standing alone. *Id.* The district court stressed this case presented issues of credibility, conflicting evidence, and inferences for the jury. *Id.* at 6. It noted the jury was entitled to believe the military pilots' testimony over Ms. Fuller's, "who was not a very credible witness," and to determine based on the evidence that Chief Nugent deferred to Ms. Fuller as the decision-maker. *Id.*

The district court denied Chief Thomas's motion to alter or amend. *Id.* at 6-7. It accepted the Sheriff's belated argument that the jury's finding of willfulness was "an advisory opinion" and the determination of liquidated damages was "ultimately

left to the" district court.  *Id.*  The district court stated it "disagree[d] with the jury's advisory finding[.]"  *Id.* at 7.

## IV.    The Standard of Review

The Court reviews the denial of a renewed motion for judgment as a matter of law de novo, but its "sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence."  *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).  The Court must "consider[] the evidence and the reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 591 (11th Cir. 2019).  The jury's verdict must be upheld unless there is "no material conflict in the evidence, such that no reasonable person could agree to the verdict reached."  *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1275 (11th Cir. 2008)).

The Court reviews the denial of a motion for new trial for abuse of discretion. *McGinnis v. Am. Home Mortg. Serv.*, 817 F.3d 1241, 1255 (11th Cir. 2016). "Deference to the district court is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed."  *Id.* (quoting *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247-48 (11th Cir. 2001)).

The review of a denial of a motion to alter or amend the judgment that turns on a question of law is de novo.  *U.S. Equal Emp. Opportunity Comm'n v.*

*St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016).  The district court's construction of a statute, like USERRA, is also reviewed de novo.  *Id.*

## SUMMARY OF THE ARGUMENT

The jury's verdict is supported by sufficient evidence that the Sheriff willfully discriminated against Chief Thomas based on his military service and retaliated against him for protected activity to enforce USERRA.  A reasonable jury could and did find that Chief Thomas's military service and protected activity were motivating factors for his termination.

Chief Thomas was told by Ms. Fuller—a supervisor who had regularly demeaned him—she thought it was unfair that military pilots like him had the same job as her and received their training for "free."  She said she would rather work with civilian pilots who she deemed more qualified.  She also told him that he could not go to a medical appointment at the VA because she was the mother and the military pilots were her children.

When Chief Thomas complained to Ms. Fuller that her comments were baseless and discriminatory, she launched an investigation into his flight records on the premise that it was her role as chief pilot, a position the FAA did not approve her for until months later.  Ms. Fuller recommended that Chief Thomas be terminated for "unverifiable" flight experience and "major discrepancies" between his résumé, pilot experience form, and electronic logbook even though the Sheriff had recently

hired Chief Thomas based on a review of the very same résumé and logbook. Ms. Fuller declined to give him an opportunity to address her concerns even though there was no urgency because he was still in EMT training and not flying at the time.

When Chief Thomas escalated his complaints about Ms. Fuller's anti-military animus to their superiors, Ms. Fuller pressed her recommendation for his termination with Chief Nugent.  Chief Nugent agreed to terminate Chief Thomas on Ms. Fuller's recommendation without warning, an outcome at odds with its earlier decision to hire him based on the same records and qualifications.

After the properly instructed jury found the Sheriff willfully discriminated and retaliated against Chief Thomas, the district court properly applied Eleventh Circuit precedent to reject the Sheriff's post-trial attempts to overturn the jury's verdict.  The Sheriff's arguments on appeal improperly invite this Court to reweigh the evidence, conflict with settled law governing employment discrimination cases, and try to revive an abandoned affirmative defense that the evidence refuted.

As to the cross-appeal, the district court reversibly erred when it did not apply the jury's finding that the Sheriff's USERRA violations were willful to award liquidated damages for two reasons.

First, the Sheriff consented to have the jury decide the issue of willfulness under Federal Rule of Civil Procedure 39(c)(2) when the issue was submitted to the jury without objection as part of Chief Thomas's claims.  The Sheriff could not

revoke its consent only once the jury found against it, and the district court could not decide to treat the verdict as merely advisory after the trial concluded.

Second, Chief Thomas had a statutory and constitutional right to a jury trial on his liquidated damages claim. USERRA expanded remedies for servicemembers and veterans to include liquidated damages after the Supreme Court held similar provisions that punished willful conduct provided a right to a jury trial. It is also fairly possible to read the term "court" in USERRA as referring to both judge and jury. In any event, the Seventh Amendment applies to USERRA's liquidated damages provision because it asserts legal rights for discrimination comparable to 18th-century actions for tort and breach of contract.

The judgment should be affirmed except that the Court should reverse on the cross-appeal and remand for the district court to award Chief Thomas liquidated damages.

## **ARGUMENT ON DIRECT APPEAL**

### I.    **The evidence that the Sheriff discriminated against Chief Thomas based on his prior military service is sufficient and supports the jury's verdict.**

USERRA prohibits an employer from discriminating against servicemembers and veterans in the conditions of their employment—hiring, retention, enjoying benefits of employment—based on their military service. 38 U.S.C. § 4311(a). The employer is liable if it treats the employee's military service as "a motivating factor

in the employer's action," unless the employer proves by a preponderance of the evidence it would have made the same decision absent the employee's military service. *Id.* § 4311(c)(1).

A motivating factor is not a decision's sole cause; it is "one of the factors that a truthful employer would list if asked for the reasons for its decision." *Coffman*, 411 F.3d at 1238. That is, an employer is liable if it "relied on, took into account, considered, or conditioned its decision on" the employee's military service. *Id.*

Because circumstantial evidence is key in discrimination cases, courts have looked to a "variety of considerations" to infer an employer's discriminatory motivation: (1) "proximity in time between the employee's military activity and the adverse employment action"; (2) "inconsistencies between the proffered reason and other actions of the employer"; (3) "an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity"; and (4) "disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.* (quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)).

Here, there was sufficient evidence for the jury to find that Chief Thomas's prior military service was a motivating factor for his termination based on Ms. Fuller's anti-military comments coupled with inconsistencies between the proffered reasons for Chief Thomas's termination and the Sheriff's other actions.

31

The Sheriff's arguments to the contrary—which the district court rejected at every critical stage—ignore the bulk of the record evidence, the deference owed to the jury's verdict, and settled law.

### A. The jury's finding of discriminatory animus is supported by evidence of Ms. Fuller's anti-military comments and inconsistencies between the reasons the Sheriff gave for terminating Chief Thomas and its other actions.

#### 1. Ms. Fuller's expressed hostility toward military pilots.

The jury reasonably found that Ms. Fuller harbored a bias against servicemembers and veterans that motivated her request to terminate Chief Thomas because they heard her hostile words to that effect. The military pilots who worked with her, including Chief Thomas, each testified she demeaned them. Her insults ranged from juvenile—"dumb" and "stupid"—to pointed criticisms of the pilots' performance—"incapable" and "incompetent." Doc.106 at 169, 179; Doc.107 at 77; Doc.108 at 177-81. When Ms. Fuller refused Chief Thomas's leave request for a VA appointment, she told him that she was the "mother" and the pilots were the "children" who "weren't allowed to question their parents." Doc.108 at 185.

If there were any question where her disdain came from, Ms. Fuller made it clear. She repeatedly and directly attacked the military pilots' service and experience. She told them that "military guys all think the same way." Doc.106 at 168. She discounted their suggestions and said the way the pilots flew in the

military was not how it was done "in the real world" and that they were "incapable of doing the Part 135 missions." Doc. 106 at 168; Doc.108 at 181. And she complained it was "unfair" that the military pilots did not pay for their flight hours, experience, and pilot ratings but could have the same job and salary as her. Doc.106 at 168-69, 189; Doc.108 at 183. She declared that "military guys" lived the "good life" where flight school was "free"—discounting and demeaning the price enlisted pilots like Chief Thomas pay in service and combat. Doc.107 at 76.

Ms. Fuller advanced the notion she would rather fly in the air rescue unit with civilian pilots who she deemed more qualified as a class. She told the military pilots that she "knew plenty of other people[,]" e.g. "civilian pilots[,]" who were more "capable … doing the missions." Doc.108 at 181-82. Similarly, she told Chief Thomas that she knew "better qualified civilian pilots" who "she would rather have in the unit" and could "replace [them] as military pilots." *Id.* at 185-86.

The district judge noted Ms. Fuller "was not a very credible witness." Doc.120 at 6. She tried to explain away insults as firehouse "banter" and offered the excuse that "everybody was giving everybody a hard time." Doc.107 at 175, 214. She said she could not "remember" referring to Chief Thomas in a derogatory manner. *Id.* at 177. The jurors heard the evidence of her hostile comments, and it supported their finding of discriminatory animus. *See Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 953 (6th Cir. 2019) (sufficient evidence of discriminatory animus

when senior manager "persistently made anti-military comments" and expressed disapproval of employee's military leave); *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009) (immediate supervisor's "expressions of hostility concerning [employee's] statutorily-excused absences from work when called to military service" sufficient to show discriminatory motivation).

### 2.    The inconsistencies between the Sheriff's claimed reasons for Chief Thomas's termination and its other actions.

The jury was able to infer animus from the inconsistencies between the reasons the Sheriff gave for Chief Thomas's termination and the Sheriff's other actions. For starters, the Sheriff hired Chief Thomas based on the same résumé and logbook that Ms. Fuller would later use to assert he had unverifiable flight experience and "major" discrepancies in his records. Doc.98-8 at 26; Doc.106 at 90. Chief Thomas passed the Sheriff's extensive interview process without having to produce his military flight records or paper logbook. Deputy Miller relied on Chief Thomas's electronic logbook, knew about the discrepancies that were due to Chief Thomas's flight history with the FBI, and advised Chief Thomas to insert a blanket entry to account for his night cross-country hours or, at the very least, knew he had done so. Doc.106 at 103-05; Doc.108 at 129, 156-62, 167-70. While Ms. Fuller claimed she did not know whether Chief Thomas had told Deputy Miller about the discrepancies in his electronic logbook, that was undermined by her own testimony that she conferred with Deputy Miller about the records. Doc.107 at 149, 206. To

suggest his records were suddenly and retroactively rendered deficient once Ms. Fuller reviewed them is not credible.

Ms. Fuller's explanation that Chief Thomas was fired because the electronic logbook meant his flight hours could not be properly verified made no sense. Deputy Miller relied on that very logbook when he verified Chief Thomas met the hiring criteria, and Ms. Fuller herself accepted and reviewed Chief Thomas's electronic logbook on January 10. Doc.107 at 150, 157-58; Doc.108 at 156-59. When Chief Thomas asked Ms. Fuller if she wanted to review his paper logbook, she said it was not necessary but took the opposite position to have him fired. Doc.107 at 21-22, 42. A jury could and reasonably did decide Chief Thomas was not fired because of the form of his flight records.

The timing of Ms. Fuller's investigation into the military pilots' flight records was also suspect. Ms. Fuller claimed she conducted the review to satisfy a recordkeeping requirement under Part 135 regulations. *Id.* at 148. But the FAA did not designate her chief pilot for the new air rescue unit until March 2019, months after she successfully pushed for Thomas's termination. Doc.106 at 6-10. The unit already "had paperwork to fly under Part 135 regulations" when she did her review, and none of the military pilots were flying at that time because they were still in EMT training. Doc.106 at 9-10; Doc.107 at 194-96, 200-201. According to the Sheriff's own initial brief, EMT training preceded the pilot certification process.

IB12.  There was no reason for Ms. Fuller to treat her review as urgent, much less deprive Chief Thomas of the opportunity to produce a "correct" and "official" record that the Sheriff admits would have satisfied Ms. Fuller's inquiry because it "did not have discrepancies."  IB5.

At bottom, the basis for Ms. Fuller's recommendation that Chief Thomas be terminated ties back to additional evidence of her anti-military animus.  Just one week before she began her investigation into the pilots' flight records, Ms. Fuller told Chief Thomas that she knew "better qualified civilian pilots" who could not only "replace" the unit pilots "as military pilots" but that "she would rather have in the unit." Doc.108 at 185-86.  Ms. Fuller admitted at trial the reason she had issues with discrepancies between the rounded hours in Chief Thomas's résumé and the hours he actually logged was because they could have put him at a hypothetical advantage over unidentified pilots that she felt would have been "more eligible" during the application process.  Doc.106 at 11.  The jury could reasonably conclude that Ms. Fuller set out to prove in her investigation that a "better qualified" civilian pilot was "more eligible" than Chief Thomas to be an air rescue pilot, even though the Sheriff had already decided he more than met the qualifications for the job.

* * *

The jury was in the best position to weigh the evidence and decide whether Ms. Fuller, on behalf of the Sheriff, abused the agency's probationary policy by

36

"looking for a reason" to terminate Chief Thomas.  *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 554 (8th Cir. 2005) (jury question as to whether employer's conduct evinced that it was "looking for a reason" to discharge employee).  There was sufficient evidence for the jury to find, as it did, that Chief Thomas's military service was a motivating factor in the Sheriff's decision to terminate him.

B.    **The Sheriff relies on a burden-shifting framework that does not apply and a same-decision affirmative defense it abandoned at trial.**

The Sheriff argues Chief Thomas failed to (1) establish a prima facie case of discrimination; (2) defeat a same-decision affirmative defense (that was not submitted to the jury); and (3) present evidence of pretext.  These arguments fail.

First, the argument that Chief Thomas failed to establish a prima facie case, IB19, 21, 30, is barred on appeal.  Burden-shifting frameworks that require an employee to establish a prima facie case of discriminatory motivation are designed to "facilitate an orderly focused evaluation of the evidence" that is "no longer relevant" after the case is submitted to a jury. *Cleveland v. Home Shopping Network, Inc.*, 269 F.3d 1189, 1194 (11th Cir. 2004); *see also Holland v. Gee*, 677 F.3d 1047, 1055-57 (11th Cir. 2012) (collecting cases).  Instead, only the sufficiency of the jury's "ultimate finding" of discrimination is considered.  *Holland*, 677 F.3d at 1057.

Second, the Sheriff's insistence that Chief Thomas "failed to rebut" its same-decision defense fails.  IB19, 34-38.  USERRA's same-decision defense is an affirmative defense that an employer must prove by a preponderance of the evidence. 38 U.S.C. § 4311(c)(1); 20 C.F.R. § 1002.22.  At the charge conference, the Sheriff said that it was not moving forward with its affirmative defenses. Doc.106 at 202-03.[6]  The Sheriff also agreed to jury instructions and a verdict form that did not include the same-decision defense.  *Id.* at 203, 207; *see also* Eleventh Circuit Pattern Jury Instructions (Civil Cases) 4.18 (2022).  As a result, the Sheriff abandoned the same-decision defense that it was required to prove to the jury.  *Cf. Mich. Abrasive Co. v. Poole*, 805 F.2d 1001, 1006 (11th Cir. 1986) (defense abandoned when party failed to advance it at trial).  The Sheriff cannot belatedly resurrect it by asking the Court to apply a *pre-trial* burden-shifting framework.

Third and finally, the Sheriff's argument that Chief Thomas failed to prove pretext rests on inapt law.  IB20, 37-38.  Pretext is the last part of the three-step *McDonnell Douglas* framework that does not apply to USERRA cases. *Coffman*, 411 F.3d at 1238-39.  USERRA applies a two-step framework in which the *employer* has the "heavier burden" to prove it would have taken adverse action in the absence of the employee's military status, rather than the *plaintiff* having to

---

[6] The Sheriff's post-trial argument that it misunderstood the district court's question, Doc.118 at 3 n.1, is belied by the fact that it never submitted its affirmative defense to the jury.

prove that the employer's litigation reason is a pretext.  *Annarumma v. City of High Springs*, 846 F. App'x 776, 782 n.8 (11th Cir. 2021).

### C.     The Sheriff's sufficiency arguments are wrong as a matter of fact and law.

Much of the Sheriff's sufficiency argument turns the legal standard for judgment as a matter of law on its head.  Rather than address the facts and inferences in the light most favorable to Chief Thomas as the law requires, *Taylor*, 940 F.3d at 591, the Sheriff wrenches snippets of evidence from context to cast the evidence in the light most favorable to it.  This only underscores the reasonableness of the jury's finding of discrimination.

The Sheriff suggests it would have been proper to fire Chief Thomas because the air rescue unit involved Part 135 operations and Chief Thomas lacked Part 135 flight experience.  IB3-4.  The Sheriff never said it fired Chief Thomas for that reason, and Part 135 flight experience was not required for his position.  In fact, the Sheriff hired Chief Thomas knowing he did not have Part 135 experience and after he took an examination on it.  Doc.98-8 at 26; Doc.108 at 153-55.

The Sheriff urges that it gave some favorable treatment to employees who had served in the military.  It notes it hired Chief Thomas knowing about his military service, it hired and retained other military pilots, and the director of operations for the law enforcement aviation unit who worked with Ms. Fuller was a military pilot.

IB14, 16, 23, 26, 28, 29.  The jury considered these facts, but they were countered by evidence of Ms. Fuller's anti-military animus.  Ms. Fuller did not hire Chief Thomas or the other military pilots, Doc.107 at 191-92, but she did get Chief Thomas fired.  Such an evidentiary dispute presents a classic jury question—one the jury resolved in Chief Thomas's favor.

That an employer treats some members of a protected group favorably[7] does not immunize it from liability for discriminating against other members of that group. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.").  And the Sheriff cannot escape liability for discrimination because Chief Nugent and Ms. Fuller may have consulted with a military pilot, Sergeant Madrigal, when they decided to terminate Chief Thomas.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against

---

[7] To be sure, Commander McDonald and Chief Larsen considered Ms. Fuller's conduct to be discriminatory.  Doc.106 at 168-69, 177; Doc.107 at 77, 81.

other members of their group." (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977))).

The Sheriff's one-sided presentation of the evidence does not make the conflicting evidence supporting the judgment disappear.  For example, the Sheriff cites Chief Nugent's testimony for the assertion that Deputy Miller told Chief Thomas to produce his paper logbook "as soon as possible," IB6 (citing Doc.106 at 142), but it ignores Chief Thomas's testimony that he was never asked to produce his paper logbook or military flight records before January 10.  Doc.108 at 129, 157.

Similarly, the Sheriff contends Chief Thomas failed to produce verifiable flight experience even though it was a condition of his employment.  IB7, 17 (citing Doc.98-1; Doc.107 at 199-200).  But that contention is countered by evidence that this purported requirement was never mentioned in the Sheriff's job posting, Doc.98-1, and that Deputy Miller was satisfied that Chief Thomas met the job qualifications at the hiring stage.  Doc.98-8 at 26; Doc.106 at 103-05.  Chief Thomas also testified he offered to get the logbook from Virginia for Ms. Fuller, but she told him that was not necessary.  Doc.107 at 21-22, 42.  The very existence of this conflicting evidence is dispositive and requires affirmance.

The Sheriff next asks the Court to reweigh the evidence of anti-military animus the jury heard and considered before it reached a verdict in Chief Thomas's favor.  After spending pages arguing there is no evidence of temporal proximity or

disparate treatment to show discrimination—considerations that Chief Thomas did not assert at trial—the Sheriff downplays Ms. Fuller's hostile comments as mere expressions of "frustration" and makes the conclusory assertion the comments were "too weak and attenuated" to "establish evidence of military bias." IB11, 16, 24-25. The comments speak for themselves. Ms. Fuller told Chief Thomas and the other military pilots that their military experience did not entitle them to the same job as her and that she would prefer to replace them with civilian pilots. Doc.106 at 168-69, 189; Doc.108 at 183, 185-86. Whether Ms. Fuller's comments were just "banter" and "frustration" or evidence of anti-military bias turned on conflicting evidence for the jury to sort out. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988) (appellate court will not "reweigh the evidence and substitute [its] judgment for that of the jury").

The Sheriff's argument that there is insufficient evidence that it gave inconsistent reasons for firing Chief Thomas, IB15, 22, fares no better. Such proof is not necessary in a USERRA case. This Court has said a factor in determining discriminatory motive is whether there were "inconsistencies between the proffered reason and *other actions of the employer*[,]" *Coffman*, 441 F.3d at 1238 (quoting *Sheehan*, 240 F.3d at 1014) (emphasis added), not inconsistent reasons.

There is ample evidence of inconsistencies between the proffered reason for Chief Thomas's termination and the Sheriff's other actions. The Sheriff's rapid

42

investigation and firing of Chief Thomas because it deemed his electronic logbook and résumé inadequate is irreconcilable with the Sheriff's reliance on the same information to hire him.  The key difference between those two decisions was one person—Ms. Fuller—who had expressed a desire to replace military pilots with civilian ones.  It was also inconsistent for the Sheriff to abruptly terminate Chief Thomas for unverified flight hours when evidence showed Deputy Miller never asked for the paper logbook that would verify them, Ms. Fuller told Chief Thomas he did not need to provide it, and the Sheriff never gave Chief Thomas the opportunity to do so before firing him.  Doc.107 at 21-22, 42; Doc.108 at 129, 157.  And it was inconsistent for the Sheriff to suggest Chief Thomas was fired for discrepancies in his logbook when those discrepancies were discussed before he was hired.  These inconsistencies were evidence the Sheriff would not have fired Chief Thomas in the absence of Ms. Fuller's anti-military animus.

Finally, the Sheriff cites a handful of cases and argues they support reversal.  IB24, 28-30.  That is incorrect.  Not one of those cases overturn a jury's verdict finding discrimination in a USERRA case.  And none of them involve the quantum of evidence of hostile comments and inconsistencies presented here.  *See Dominguez v. Miami-Dade Cnty.*, 416 F. App'x 884, 885 (11th Cir. 2011) (no dispute that employer's actions were due to arrest for theft, not military status); *Coffman*, 411 F.3d at 1239 (failure-to-hire claim did not survive summary judgment when

43

prospective employer expressed no hostility toward service members and no inconsistencies between proffered reason for failure to hire and other actions); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (vacating judgment in Title VII case because decision to terminate employee with "troubled disciplinary record" was made by independent civil service board after full evidentiary hearing); *Sheehan*, 240 F.3d at 1015 (mere evidence prospective employee was part of protected class insufficient to prove discrimination); *Loperena v. Scott*, No. 2:08-cv-99, 2009 WL 1066253, at *14 (M.D. Fla. Apr. 21, 2009), *aff'd* 356 F. App'x 240, 242-243 (11th Cir. 2009) (summary judgment appropriate on failure-to-hire claim when only evidence plaintiff marshalled was proximity in time and employer's knowledge of prior military experience).  None of these inapt decisions support reversal.

## D. Sufficient evidence and the law support a cat's paw theory of liability against the Sheriff.

The Sheriff's final sufficiency argument is that it should not be liable for Ms. Fuller's discrimination because it was Chief Nugent, not Ms. Fuller, who terminated Chief Thomas.  IB10, 16, 25.  That argument is defeated by both on-point Supreme Court precedent and the evidence.

In *Staub v. Proctor Hosp.*, the Supreme Court recognized the "cat's paw" theory of liability in a USERRA discrimination case.  562 U.S. 411, 422 (2011).  It

held that an employer is liable for a biased supervisor's discriminatory act if the supervisor intended to cause an adverse employment action and the supervisor's act is a proximate cause of the decision-maker's later adverse employment action. *Id.* at 419. The fact that an ultimate decision-maker exercises judgment when taking an adverse employment action does not break the causal chain if the chain began with the supervisor's discriminatory animus. *Id.* at 420. Indeed, a discriminatory supervisor's report "may remain a causal factor" even if there is a different decision-maker who makes an independent investigation, unless the independent investigation does not take the report into account or the decision-maker considers evidence that justifies the adverse action separate and apart from the supervisor's recommendation. *Id.* at 421; *see also Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021) (independent investigation does not absolve employer of fault unless "the adverse action is entirely justified apart from the biased supervisor's recommendation").

The cat's paw theory applies here and supports the judgment. In fact, both parties recognized its applicability during jury deliberations. They agreed to respond to a jury question by explaining that if the jury found "that [Ms.] Fuller was the decision-maker or [Chief] Nugent rubber-stamped her decision," then it could find the Sheriff liable. Doc.105 at 64.

Ms. Fuller recommended that Chief Nugent, the ultimate decision-maker, terminate Chief Thomas.  Doc.96-2 at 1.  Chief Nugent was not a pilot and did not perform any independent investigation.  Ms. Fuller and Chief Nugent testified they met to go over Chief Thomas's electronic logbook after Ms. Fuller made her recommendation.  Doc.106 at 133-34; Doc.107 at 172-73.  Ms. Fuller reviewed the FAA regulations with Chief Nugent, and Chief Nugent admitted she would not have known what she was looking for and relied on her "experts."   Doc.106 at 133-34, 148; Doc.107 at 172-73.  Commander McDonald observed the Sheriff typically followed Ms. Fuller's lead because it "didn't know a whole lot."  Doc.106 at 177.  This was more than sufficient evidence for the jury to find Ms. Fuller's discriminatory act—her recommendation to fire Chief Thomas—was a proximate cause of Chief Thomas's termination.

The district court correctly ruled the cat's paw theory applied to this case when it denied the Sheriff's motion for judgment as a matter of law, *Id.* at 200-01, and when the jury asked whether the Sheriff could be held liable for Ms. Fuller's discrimination, Doc.105 at 64-70.  The Sheriff does not argue the district court's rulings or the supplemental cat's paw instruction it gave the jury were erroneous. *Id.* at 69-70; *see also Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 924 (11th Cir. 2022) (jury presumed to follow given instructions).  Instead, it relies on its version of the conflicting evidence, IB25-26, a classic jury question.

**II.  The evidence the Sheriff retaliated against Chief Thomas based on his protected activity is sufficient to support the jury's verdict.**

An employer is prohibited from taking an adverse employment action against an employee who engages in protected activity, such as taking an action to enforce USERRA.  38 U.S.C. § 4311(b); *see also Jones v. Dep't of Health & Human Servs.*, 703 F. App'x 977, 980 (Fed. Cir. 2017) (discussing elements of USERRA retaliation claim).  Like with a discrimination charge, the employer is liable for retaliation if the employee's protected activity "is a motivating factor in the employer's action," unless the employer proves it would have taken the same action absent the employee's protected activity.  38 U.S.C. § 4311(c)(2).

There is evidence that protected activity was a motivating factor in the employer's action when there is a "close temporal proximity between the statutorily protected activity and adverse-employment action."  *Ward v. United Parcel Serv.*, 580 F. App'x 735, 739 (11th Cir. 2014).  The employee may also point to "a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate."  *Id.*

Chief Thomas engaged in protected activity when he first complained directly to Ms. Fuller and later to Chief Smith and Chief Nugent about Ms. Fuller's discriminatory hostility toward military pilots and her refusal to allow him to take leave for a VA appointment.  Doc.106 at 170-73; Doc.107 at 80, 83; Doc.108

at 181, 185-86, 201, 204.  Servicemembers and veterans may not be denied any "benefit of employment" based on their military service, including a leave of absence or a non-hostile workplace. 38 U.S.C. §§ 4303(2), 4311(a); *see also Annarumma*, 846 F. Appx at 785 (assuming hostile work environment claims are actionable under USERRA); *Hackett v. City of South Bend*, 956 F.3d 504, 508-09 (7th Cir. 2020) (textual basis in USERRA for hostile work environment claims). Chief Thomas's complaints to Ms. Fuller and the superior officers were actions to enforce USERRA.  *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 854-55 (8th Cir. 2002), *abrogated on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (USERRA contemplates employee's "[v]arious informal activities" are protected action to enforce Act).  And as the jury was instructed, Chief Thomas only needed to show an objectively reasonable belief that his complaints were to enforce USERRA to prove he engaged in protected activity.  Doc.89 at 14; *see also Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (protected activity element rests on employee's "good faith, reasonable belief" of unlawful employment practice).

Sufficient evidence also linked Chief Thomas's protected activity (complaints to Ms. Fuller, Chief Smith, and Chief Nugent) to his termination.  Chief Thomas complained to Ms. Fuller in December about her anti-military animus, including on December 26 when she told him that she knew "better qualified civilian pilots" that

could not only "replace [them] as military pilots" but that "she would rather have in the unit." Doc.106 at 171; Doc.108 at 181, 185-86. Only one week later, Ms. Fuller suddenly began to investigate the military pilots' flight records. Eight days after that, she sent her recommendation to Chief Nugent that Chief Thomas should be terminated. Doc.96-2 at 1. One month, or even a matter of weeks, is the close temporal proximity that an employee may use to prove a retaliatory motive. *See Schmidt v. City of Atlanta*, 558 F. App'x 953, 955 (11th Cir. 2014) ("one-month gap" between protected activity and adverse action "can suffice to show a link").

There was also close temporal proximity between Chief Thomas's complaint to Chief Nugent about Ms. Fuller's anti-military statements and actions and Chief Nugent's decision to follow Ms. Fuller's recommendation for termination rather than address his complaints. Chief Thomas was terminated only 10 days after he brought his complaints to Chief Smith and Chief Nugent on January 17 and 18, respectively. During the January 18 meeting, Chief Nugent dismissed Chief Thomas's complaints about Ms. Fuller and told the military pilots they would need to find a way to get along. Doc.107 at 101; Doc.108 at 203. And it was ultimately Chief Nugent who approved Chief Thomas's termination based on Ms. Fuller's recommendation. Doc.108 at 205-211. That evidence supports the jury's verdict that his protected activity was a motivating factor in his termination.

49

The Sheriff gives three reasons it believes it is entitled to judgment as a matter of law on retaliation. None are availing.

First, the Sheriff claims Chief Thomas did not engage in protected activity because he "did not complain about being denied employment or any other adverse job action protected under USERRA." IB32. This argument is blind to the record evidence. It ignores testimony about the timing and substance of Chief Thomas's complaints about Ms. Fuller's conduct. Doc.106 at 171; Doc.108 at 181, 185-86. That evidence showed Chief Thomas had an objectively reasonable belief his complaints were to enforce USERRA because he was trying to stop Ms. Fuller's hostile anti-military comments and related conduct.

Second, the Sheriff argues there is no evidence of causation because "there is no temporal proximity or causation where the actions that ultimately lead to the challenged employment decision began prior to the alleged protected activity." IB33 (citing *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006)). The Sheriff is mistaken. Ms. Fuller's actions leading to Chief Thomas's termination did not begin until *after* Chief Thomas complained to Ms. Fuller about her hostile and discriminatory comments and actions in December. *See Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1279 (11th Cir. 2020) (test is whether employee's termination was "set in motion" prior to protected activity).

50

Ms. Fuller began to investigate the military pilots' flight records and sought Chief Thomas's termination only after Chief Thomas complained about anti-military animus.   When he elevated his complaints to Chief Smith and Chief Nugent, Ms. Fuller pressed Chief Nugent to terminate him.   This case does not resemble *Drago*, in which "the record evidence [was] overwhelming that [the employer] contemplated demoting [the employee] before he ever complained."   453 F.3d at 1308.  Because Chief Thomas's termination was not "set in motion" prior to his protected activity, the evidence showed close temporal proximity to his termination. That evidence is sufficient proof of retaliation.

Third, the Sheriff's rehash of its same-decision defense to challenge the jury's verdict on retaliation falls flat.  IB34-38.  As explained, the Sheriff abandoned that affirmative defense.  Doc.106 at 203, 207; *see Mich. Abrasive Co.,* 805 F.2d at 1006. In any event, the conflicting evidence did not support this defense as a matter of law, which the Sheriff must show to win judgment in its favor.  Ms. Fuller's request for Chief Thomas's logbooks was sudden, and Chief Thomas had not previously been asked to produce his paper logbook.  Doc.107 at 20-22; Doc.108 at 129, 157, 187. Ms. Fuller spent only three hours with the records before she decided Chief Thomas should be terminated.  There was no need for such haste because Chief Thomas was still in EMT training and Ms. Fuller had not yet been designated by the FAA as chief pilot.  Doc.96-2 at 1; Doc.106 at 6-10; Doc.107 at 148, 200-01, 225.  Rather than

accept Chief Thomas's offer to produce his logbook or explain the discrepancies, Ms. Fuller pushed for termination until Chief Nugent acquiesced. Doc.106 at 133-34; Doc.107 at 172-73. Even if the Sheriff had not abandoned its same-decision defense, it could not possibly entitle the Sheriff to judgment as a matter of law. *See Wallace v. San Diego*, 479 F.3d 616, 629-39 (9th Cir. 2007) (jury not required to credit evidence of legitimate reason for adverse action when action was "within department policy" but "unusually harsh").

The Sheriff's same-decision defense fails for the additional reason that the Sheriff offered *no* evidence of a key element—that Ms. Fuller would have recommended Chief Thomas's termination absent his veteran status and protected activity. As explained in *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 20 (1st Cir. 2007), proof that an employee committed a punishable offense is not enough to establish the same-decision defense. The employer "must go further and demonstrate by a preponderance of the evidence, that it *would* indeed have fired [the employee], regardless of his military status." *Id.* Where, as here, the employee is not warned that his conduct was wrongful or that he is being considered for termination, there is "sufficient doubt on the issue to make it a jury question." *Id.* at 20-21.

The jury's retaliation verdict was supported by sufficient evidence that Chief Thomas engaged in protected conduct that motivated the Sheriff's decision to terminate him. The judgment should be affirmed.

## III. The district court did not abuse its discretion when it denied the Sheriff's motion for new trial because the verdict was not against the great weight of the evidence.

The Sheriff admits it is not entitled to a new trial unless the verdict was against "the clear weight of the undisputed evidence." IB18; *see also McGinnis*, 817 F.3d at 1254. Because it was not, no abuse of discretion is shown.

This was a straightforward case that hinged on conflicting evidence. There is no claim of evidentiary error. The evidence, including Chief Thomas, Chief Larsen, and Commander McDonald's testimony, proved Ms. Fuller's discriminatory conduct and the Sheriff's abrupt about-face to fire a qualified pilot based on the review of information the Sheriff had only recently considered to hire him. The verdict in Chief Thomas's favor was not against the great weight of the evidence. *See Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir. 1982) (courts are "considerably less inclined to disturb a jury verdict" on cases with "simple issues" and without "pernicious occurrences").

The cases the Sheriff relies on—*Ins. Co. of N. Am. v. Valente*, 933 F.2d 921 (11th Cir. 1991), and *Ard v. Sw. Forest Indus.*, 849 F.2d 517 (11th Cir. 1988)—do not support its argument for a new trial. IB39-40. *Valente* is an insurance coverage

53

case in which the district court denied a motion for new trial based on undisputed expert testimony. 933 F.2d at 925. No such evidence backs the Sheriff's case here. *Ard* is legally and factually inapposite. It involved an order *granting* a new trial and evidence that was virtually uncontradicted with no issues of witness credibility. 849 F.2d at 521-22. By contrast, in this case, the parties offered diametrically opposite testimony from multiple witnesses about Chief Thomas's employment and termination. And the district court specifically noted that Ms. Fuller, the Sheriff's key witness, was not credible. Doc.120 at 6.

The district court had the "opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record[.]" *Warren v. Ford Motor Credit Co.*, 693 F.2d 1373, 1375 (11th Cir. 1982) (quoting *Massey v. Gulf Oil Corp.*, 508 F.2d 92, 94-95 (5th Cir. 1975)). From its unique vantage point, the district court deemed Ms. Fuller not credible and concluded that "[t]he jury was entitled to believe" Chief Thomas and the other military pilots' corroborating testimony. Doc.120 at 6. It did not abuse its discretion in denying the Sheriff a new trial.

## ARGUMENT ON CROSS-APPEAL

**The district court reversibly erred when it declined to award Chief Thomas liquidated damages despite the jury's finding the Sheriff's discrimination was willful.**

Under USERRA, an employee is entitled to an award of liquidated damages equal to his lost wages or benefits "if the court determines" violative conduct is willful. 38 U.S.C. § 4323(d)(1)(C). The parties submitted to the jury the issue of willfulness as part of Chief Thomas's claims, and the jury found the Sheriff acted willfully. Doc.88. The district court's judgment denying Chief Thomas's liquidated damages and limiting his recovery to $240,000 in lost wages and benefits is inconsistent with the Federal Rules of Civil Procedure, the language of USERRA, and the Seventh Amendment. The Court should reverse and remand for the district court to enter judgment in the amount of $480,000 plus post-judgment interest.

### A. The parties consented to a jury trial on whether the Sheriff's conduct was willful, and the district court was bound by the verdict the jury returned.

Federal Rules of Civil Procedure 38 and 39 govern jury trial demands. Even when a party has no "right" to a jury trial on a specific issue, the issue may be tried to a jury in two ways: (1) the court empanels an advisory jury; or (2) the parties consent to have the issue tried by a jury that will return a verdict with "the same legal effect" as if there were a right to a jury trial. Fed. R. Civ. P. 39(c). Once an issue is presented to a jury by consent under Rule 39(c)(2), the "legal effect" of the verdict

is that a federal court may not re-examine the jury's finding of fact when there is evidence to justify it. *See* U.S. Const. amend. VII (forbidding re-examination of facts tried to a jury); *see also Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1003 (11th Cir. 2021) (jury's findings entitled to deference afforded under Rule 50); *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 22 (1st Cir. 1998) (sufficiency review of jury's verdict from trial by consent same as verdict where trial was matter of right).

Chief Thomas had a statutory and constitutional right to a jury trial on the issue of willfulness, and he properly demanded one. Doc.16 at 11. But even if he had no such right, the parties consented to have the jury decide willfulness under Rule 39(c)(2) and the jury's well-supported finding was binding.

A party consents to trial by jury on an issue if it fails to object before the trial begins. *See Whiting v. Jackson State Univ.*, 616 F.2d 116, 123 (5th Cir. 1980) ("By failing to object, the parties agreed that the jury's verdict on the claims for equitable relief was to have the same effect as if a right to a jury trial existed.")[8]; *see also Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) (failure to object to complaint that demands jury trial "as to all issues herein" was implied consent under Rule 39(c)(2)); *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166

---

[8] Decisions from the Fifth Circuit entered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

F.3d 772, 795-96 (5th Cir. 1999) (party's failure to object to non-advisory jury after demand for jury trial is trial by consent); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2333 (4th ed. 2022). Once a party has consented to the jury's consideration of an issue, it cannot reverse fields and argue the jury's verdict, already returned, should be deemed only "advisory." *See Am. Underground Eng'g, Inc. v. City of Syracuse*, 526 F. App'x 37, 40 (2d Cir. 2013) ("silence may be deemed consent under Rule 39(c)" when objecting party did not mention "advisory jury" until post-trial motion); *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989) (when parties requested jury trial and "advisory jury was never mentioned during the proceedings," parties consented to trial by non-advisory jury).

The Sheriff consented to a jury trial on all of Chief Thomas's claims, including whether it discriminated or retaliated willfully. The district court and the parties knew the jury would decide that issue. The parties jointly submitted their proposed jury instructions, which included this Court's pattern jury instruction on willfulness. Doc.71 at 29, 35. Chief Thomas also filed a proposed verdict form that included an Eleventh Circuit pattern special interrogatory asking if the Sheriff's conduct was willful. Doc.74 at 4, 6.

The Sheriff agreed to these instructions and verdict form at the charge conference. Doc.106 at 203, 207. It did not object after the instructions were given

to the jury.  Doc.105 at 43-59.  The Sheriff never suggested the jury's verdict on willfulness would be only an "advisory opinion" until the verdict came back against it.  Doc.104.  The law prohibits the Sheriff from retracting its consent once it receives an unfavorable result.

It was impermissible for the district court to treat the jury's finding as merely advisory after the fact.  *See Alcatel USA*, 166 F.3d at 795-96 (district court must give parties' advance notice if it will consider verdict advisory);  *Thompson v. Parkes*, 963 F.2d 885, 888 (6th Cir. 1992) (Rule 39(c)(1) allows for "advisory jury" and "not to have the case tried by a jury and essentially exercise a veto power"); *Bereda*, 865 F.2d at 53 (district court must inform parties of jury's "advisory status" no later than beginning of jury selection).  But at the Sheriff's urging, that is what the district court did.  It "note[d]" the jury "answered a non-binding special interrogatory as to whether [the Sheriff] willfully violated the law," and said the Court "request[ed]" the "advisory opinion from the jury[.]"  Doc.120 at 6-7.  That ruling was neither requested nor made before trial.

Chief Thomas's motion to amend the judgment pointed out that the jury's verdict gave him an explicit right to recover liquidated damages.  Doc.95 at 2.  The district court could not contradict the jury's binding determination on the only precondition to an award of liquidated damages.  *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1165 (11th Cir. 2008) (district court

precluded from finding employer's conduct was in good faith to discount or eliminate award of liquidated damages after jury determined employer's conduct was willful); *Castle*, 837 F.2d at 1561 (same); *Lindsey v. Am. Cast Iron Pipe Co.*, 810 F.2d 1094, 1098 (11th Cir. 1987) (district court may not reconsider issue on damages that jury "necessarily or actually decided"). And the Sheriff did not move to set aside the finding, which it addressed only in response to Chief Thomas's motion to amend. Doc.104.

The district court erred when it treated the jury's finding of willfulness as advisory and entered judgment without awarding liquidated damages. *See Lindsey*, 810 F.2d at 1098 (reversing and awarding liquidated damages when district court's ruling contradicted actual issues jury determined). That error requires reversal with directions to enter a judgment awarding Chief Thomas liquidated damages consistent with the jury's verdict. *See Alvarez Perez*, 515 F.3d at 1165 (reversing with direction to enter judgment awarding liquidated damages consistent with jury's willfullness finding).

### B. Chief Thomas was entitled to a jury trial as a matter of right on the issue of whether the Sheriff's conduct was willful.

It is no surprise the parties consented to a jury trial on Chief Thomas's right to liquidated damages. He had that right under USERRA and the Constitution. The Sheriff's argument to the contrary—that USERRA gives a district court absolute

discretion whether to award a plaintiff liquidated damages—is based on a cramped reading of the statute that lacks context and ignores the Seventh Amendment. Doc.104 at 1.

A party's right to a jury trial may arise from a statutory grant or the Seventh Amendment, which applies to all "suits" that assert "legal rights" or are analogous to causes of action brought in the English courts of law. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989). Because there is a looming Seventh Amendment concern with any deprivation of the right to a jury trial, the Court should find a statutory right if it is "fairly possible" to read a statute as providing one. *See Tull v. United States*, 481 U.S. 412, 417 n.3 (1987) (explaining "cardinal principle" of constitutional doubt canon); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247-48 (2012) (constitutional doubt canon serves to avoid interpretations that "raise serious questions of constitutionality").

USERRA granted Chief Thomas the right to a jury trial on his liquidated damages claim for at least two reasons. First, Congress provided for liquidated damages in USERRA at a time when the Supreme Court had made clear such damages to punish willful conduct require a jury trial under the Seventh Amendment. Second, the term "court" in USERRA must be reasonably understood to include the "jury" and not just the district judge.

60

While USERRA's predecessor, the Veterans' Reemployment Rights Act of 1974, provided only equitable remedies, Congress enacted USERRA in 1994 to "strengthen the existing veterans' employment and reemployment rights provisions."    H.R.Rep. No. 103–65(I), at 18 (1993) (reprinted in 1994 U.S.C.C.A.N. 2449, 2451).    Congress legislated against the backdrop of Supreme Court decisions holding that liquidated damages awarded for a wrongdoer's willful violations are punitive and implicate the Seventh Amendment right to a jury trial. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125-26 (1985) (Congress intended award for liquidated damages under ADEA based on willful conduct was punitive); *Curtis v. Loether*, 415 U.S. 189, 195-96 (1974) (Seventh Amendment applies to actions to enforce actual and punitive damages); *see also Nielsen v. Preap*, 139 S. Ct. 954, 967 (2019) (assumed that Congress legislates against "legal backdrop").

That USERRA did not merely expand the VRRA's equitable remedies but authorized a new legal one—liquidated damages for willful conduct—is strong textual evidence that Congress intended to provide servicemembers and veterans the right to a jury trial for their legal remedies.  *See Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir. 2009) (expansion of USERRA remedies "brought along the corresponding right to a jury trial").

61

The district court believed that it, not the jury, had the authority to render the decision on liquidated damages based on the statute's use of the term "court." The district court read that term to apply only to the district judge entering judgment and not to the jury. Doc.120 at 6. But the definition of "court" is not so limited.

As Justice Scalia explained in his concurrence in *Feltner v. Columbia Pictures Television, Inc.*, the term "court" can be read to include a trial by both judge and jury. 523 U.S. 340, 356 (1998) (Scalia, J., concurring). In *Feltner*, the Supreme Court held the Seventh Amendment guaranteed the right to a jury trial on issues pertinent to an award of statutory damages under section 504(c) of the Copyright Act, which provided for the determination of an amount between $500 and $20,000 "as the court considers just." *Id.* at 355. In his concurrence, Justice Scalia said the Court did not need to reach the constitutional question because section 504 could be read to authorize the jury to determine the amount of statutory damages based on the statute's use of the word "court." *Id.* at 356. He explained that "court" had a "broader meaning" that included "both judge and jury." *Id.* (citing Webster's New International Dictionary 611 (2d ed. 1949) (def. 10b); Black's Law Dictionary 318 (5th ed. 1979)).

This Court reached the same conclusion in *Sibley v. Fulton DeKalb Collection Serv.*, 677 F.2d 830, 832-33 (11th Cir. 1982). The *Sibley* court examined whether a party was entitled to a jury trial in an action for damages under the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692.  677 F.2d at 831-832.  The FDCPA provided for statutory damages that did not exceed $1,000 "as the court may allow." *Id.* at 832 (citing 15 U.S.C. § 1692k(a)(2)(A)).  The Court rejected the debt collector's argument that Congress intended a judge try statutory damages claims under the FDCPA because, it held, the statute's use of the term "court" included "trial by both judge and jury." *Id.* at 832-33 (collecting cases).  The Court held that the inclusive interpretation was also necessary to avoid a "serious constitutional question" under the Seventh Amendment if the Court were to interpret the statute to deprive a claimant of a jury trial. *Id.* at 833.

Here, as in *Sibley* and consistent with Justice Scalia's concurrence in *Feltner*, the word "court" should be read to mean both the district judge and the jury.  The Sheriff argued the district court had discretion to ignore the jury's finding because the statute says "the court *may*" award liquidated damages.  Doc.104 at 2.  In fact, each remedy provision in section 4323(d)(1)—for injunctive relief, compensatory damages, and liquidated damages—begins with "the court may."  38 U.S.C. § 4323(d)(1)(A)-(C).  This reinforces the interpretation of the word "court" to mean, as this Court said in *Sibley*, both judge and jury because there is no question that it is the district judge's role to grant injunctive relief under section (d)(1)(A) and the jury's to decide compensatory damages under (d)(1)(B). *See Waldrop v. S. Co.*

*Servs., Inc.*, 24 F.3d 152, 157-58 (11th Cir. 1994) (award of lost wages is legal, not equitable, remedy "in the nature of compensatory damages").

In sum, USERRA's liquidated damages provision is properly interpreted as preserving the right to a jury trial. *See DeLee v. City of Plymouth, Ind.*, 773 F.3d 172, 174 n.1 (7th Cir. 2014) (plaintiff is "entitled to" jury trial on "liquidated damages claim under USERRA" (citing *Middleton*, 578 F.3d at 659)). The statute provides a remedy that is punitive in nature, which the Supreme Court recognized prior to USERRA's enactment would trigger the right to a jury trial. And the term "court" means trial by both judge and jury such that it allocates a role to the jury to "determine[] that the employer's failure to comply with the provisions of [USERRA] was willful." 38 U.S.C. § 4323(d)(1)(C).

If, as the Sheriff urged below, USERRA were narrowly interpreted to conclude that only a district court judge could determine the issue of liquidated damages, Chief Thomas would still be entitled to liquidated damages based on the jury's finding of willfulness. That is because Chief Thomas also had a Seventh Amendment right to the jury determination that the district court violated when it re-examined the jury's willfulness finding. *See Feltner*, 523 U.S. at 347 (reaching constitutional question when there is no statutory right).

As explained, the Seventh Amendment applies to claims that assert legal rather than equitable rights or are analogous to causes of action brought in the

English courts of law. *Granfinanciera, S.A.*, 492 U.S. at 41-42. USERRA checks both boxes. It provides for damages that are actual and punitive in nature, traditional legal remedies. *Curtis*, 415 U.S. at 196. And USERRA's liquidated damages provision provides a remedy for discrimination that is comparable to 18th-century actions for tort and breach of contract. *See Waldrop*, 24 F.3d at 156 (analogizing statutes that prohibit discrimination and retaliation against protected employees to claims in English courts of law). Chief Thomas had a constitutional right to a jury trial on the issue of liquidated damages, and the district court erred when it failed to abide by the jury's finding of willfulness and award liquidated damages. *See Day v. Liberty Nat'l Life Ins. Co.*, 122 F.3d 1012, 1016 (11th Cir. 1997) (question of willfulness under ADEA liquidated damages provision goes to jury and finding cannot be readily disturbed).

* * *

The issue of willfulness was tried by consent and as a matter of right. The district court reversibly erred when it treated that finding as advisory and failed to award Chief Thomas liquidated damages.

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the judgment in the direct appeal but reverse on the cross-appeal and remand for the district court to enter judgment for Chief Thomas in the amount of $480,000 plus post-judgment interest.

Respectfully submitted,

/s/ *Brandon K. Breslow*
Brandon K. Breslow, FBN 123755
Kristin A. Norse, FBN 965634
Stuart C. Markman, FBN 322571
Kynes, Markman & Felman, P.A.
P.O. Box 3396
Tampa, Florida 33601
Telephone: (813) 229-1118
Facsimile: (813) 221-6750
bbreslow@kmf-law.com
knorse@kmf-law.com
smarkman@kmf-law.com
efilings@kmf-law.com

*Counsel for Appellee/Cross-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in FRAP 28.1(e)(2)(B). This brief contains 15,286 words excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. R. 32-4. This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6). It has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman font.

/s/ *Brandon K. Breslow*
Brandon K. Breslow

67

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 31, 2022, I filed the foregoing with the Clerk of Court using the Electronic Filing System which will send a Notice of Docket Activity to all counsel of record.

/s/ *Brandon K. Breslow*
Brandon K. Breslow


I further certify that on August 31, 2022, four copies were furnished to the Court via Federal Express.

/s/ *Brandon K. Breslow*
Brandon K. Breslow

68